THE PEOPLE OF THE STATE OF NEW YORK ex rel. MICHAEL
J. COFFEY, Appellant, *v.* THE DEMOCRATIC GENERAL COM-
MITTEE OF KINGS COUNTY, Respondent.

PRIMARY ELECTION LAW — MEMBER OF GENERAL COMMITTEE CANNOT
BE REMOVED BY COMMITTEE. A member of the general committee of a
political party of a county, who has been duly elected under the provis-
ions of the Primary Election Law (L. 1899, ch. 473), cannot be removed
from office as a member of such committee by the committee itself, under
any pretext whatever, since it is the manifest intent of the statute that the
majority of the primary voters are entitled to select any representative
they may desire upon such committee, who shall be responsible to those
electing him, and only to them, for his conduct.

*People ex rel. Coffey* v. *Democratic Gen. Com.*, 52 App. Div. 170, reversed.

(Argued June 13, 1900; decided October 9, 1900.)

APPEAL from an order of the Appellate Division of the
Supreme Court in the second judicial department, entered June
5, 1900, reversing an order of Special Term granting a per-
emptory writ of mandamus requiring the defendant to place
the name of the relator upon its membership roll and to restore
him to the rights and privileges pertaining to membership in
the Democratic general committee of Kings county.

At a primary election held in September, 1899, the relator
was duly elected a member of the Democratic general com-
mittee of Kings county and afterwards duly qualified by pay-
ing the prescribed dues. At a meeting of such committee
held March 23, 1900, he was, by resolution, expelled for
alleged disloyalty and open hostility to the Democratic party,
and has since been debarred from exercising the rights and privi-
leges pertaining to his office as a member of such committee.

*Isaac M. Kapper* and *Luke D. Stapleton* for appellant.
When the relator was elected a member of the Democratic
general committee of Kings county in the manner prescribed
by the Primary Election Law, he was elected to an office
created by law, and his associates, elected at the same time
and in the same manner as himself, were powerless to expel

him.· (*People ex rel.* v. *Van Wyck*, 157 N. Y. 495; *People ex rel.* v. *Jeroloman*, 139 N. Y. 14, 18; *McKane* v. *Adams*, 123 N. Y. 609; Throop on Public Officers, § 8.)   The Appellate Division erred in ruling that there was an inherent power in the respondent committee to expel one of its duly elected members.   (*People ex rel.* v. *Hall*, 80 N. Y. 117; *People ex rel.* v. *Suprs. of Queens*, 131 N. Y. 468, 471; *People ex rel.* v. *Feeney*, 43 App. Div. 376; *Davidsburgh* v. *K. L. Ins. Co.*, 90 N. Y. 526; *Landers* v. *S. I. R. R. Co.*, 53 N. Y. 450; *Austin* v. *Searing*, 16 N. Y. 123.)   The answer of the respondent to the relator's petition for the writ, asserting political hostility on his part at the last general election held in Kings county, is insufficient in law, and entitles the relator to the relief sought.   (*People ex rel.* v. *Keeler*, 99 N. Y. 463.)

*E. Countryman*, intervening counsel.   The Primary Election Law does not prescribe or require as a hard and fast rule that a member of either of the great political organizations shall support all of the candidates of his party at the general election.   (L. 1899, ch. 473, §§ 2, 3.)   The contention that the county committee had the inherent power to expel the plaintiff for hostility to one or more of the local nominees on the ticket of the Democratic organization is untenable.   (Angell & Ames on Corp. [11th ed.] § 410; 2 Cook on Corp. [4th ed.] §§ 624, 711; *White* v. *Brownell*, 2 Daly, 329; *McKane* v. *Adams*, 123 N. Y. 609; *O'Brien* v. *Grant*, 146 N. Y. 164; *Belton* v. *Hatch*, 109 N. Y. 593; *People ex rel.* v. *N. Y. C. Exchange*, 8 Hun, 216; *Evans* v. *Phil. Club*, 50 Penn. St. 107; *Comm.* v. *S. P. B. Society*, 2 Binn. 441; *Comm.* v. *German Soc.*, 15 Penn. St. 251; *Beneficial Assn. of B. U. Case*, 38 Penn. St. 298, 300; 35 Penn. St. 151.)

*Charles J. Patterson* and *Henry J. Furlong* for respondent.   If the rules and regulations contained no provision authorizing the expulsion of the relator for hostility, the general committee would still possess the inherent power and authority to expel him for cause.   (Anson on Law & Custom

of Const. 56; May on Parl. Prac. 114; *Hiss* v. *Bartlett,* 3 Gray, 468; Cooley on Const. Lim. 159, 160; Story on Const. [5th ed.] § 838; Paschal's Anno. Const. 87, § 49; 1 Dillon Mun. Corp. [4th ed.] 329, § 242; *Rex* v. *Richards,* 1 Burr. 517; *People ex rel.* v. *Bd. Fire Underwriters,* 7 Hun, 248; *McKane* v. *Adams,* 123 N. Y. 609; L. 1899, ch. 473, § 9; *Sheehan* v. *McMahon,* 28 Misc. Rep. 733.) If the right of the general committee to expel the relator be dependent upon the existence of rules and regulations expressly authorizing it to do so, the existence of such rules and regulations is fully established. (*Matter of Guess,* 16 Misc. Rep. 307.) The claim that the relator was elected by the people and, therefore, could not be deprived of his office by the general committee is untenable. (*Hiss* v. *Bartlett,* 3 Gray, 468.) As the general committee had power to expel the relator for cause, the propriety of their action in so doing will not be reviewed upon an application for a mandamus. (*Matter of Abrams,* 45 Hun, 272, 273; *People ex rel.* v. *Chapin,* 104 N. Y. 96; *People ex rel.* v. *Chapin,* 103 N. Y. 635; *People ex rel.* v. *Barnes,* 114 N. Y. 317; *People ex rel.* v. *Supervisors,* 14 Abb. [N. C.] 29; *People ex rel.* v. *Hulse,* 38 Hun, 388; *People ex rel.* v. *Hall,* 80 N. Y. 117; *U. S.* v. *Black,* 128 U. S. 40; *People ex rel.* v. *New Rochelle,* 17 App. Div. 603; *People ex rel.* v. *Auditors,* 43 App. Div. 22.)

PARKER, Ch. J. The fundamental question in this case is whether a member of the general committee of a county may be removed from office as a member of the committee. The answer to it depends upon the construction now to be given to the Primary Election Law (Chapter 473 of the Laws of 1899, vol. II), section first of which, in declaring the application of the act, says: "It shall be *controlling;* (1) on the methods of enrolling the voters * * *; (2) on primary elections * * *; (3) on party conventions * * *; (4) on the *choice* * * * *of political committees* and on the *conduct of political committees* in and for any political subdivision of the state * * *."

43

It will help us intelligently to consider the statute if we call to mind preceding legislation intended to protect the rights of minorities; the statute law looking to the purity of the ballot, and the organic law having for its purpose the encouragement of independent action in matters relating to municipal government. The help will come from our possession of the situation in which the legislators were when, in 1899, they passed the statute in question, which was in part composed of the general drift of public opinion and the fault which that public opinion had found with the machinery for the election of public officials. The settled conviction that the safeguarding of our institutions requires the untrammeled exercise of the franchise by the citizens and that the result be protected from fraud, has led to no inconsiderable amount of legislation during the present generation — legislation aimed largely, although not entirely, at the frauds of majorities who, at times, have manifested a disposition to retain their power, let the cost be what it might. The frauds that have perhaps occasioned the greatest amount of discussion resulted from colonization and repeating, for the correction of which several registry acts were passed. At the outset the legislation on that subject proceeded on the view that only in great cities were such frauds practiced, but such view proved to be partial, and in 1890 a general registry law was passed applicable to all of the state except the cities of New York and Brooklyn. (Chapter 321 of the Laws of 1890.) In those cities registration had long been required. (Chapter 142 of the Laws of 1880.) An enlightened public sentiment was at the same time making war against the evils of bribery and the outcome was a new departure in our method of voting, under the provisions of an act entitled "An act to promote the independence of voters at public elections, enforce the secrecy of the ballot, and provide for the printing and distribution of the ballot at public expense." (Chapter 262 of the Laws of 1890.) This act inaugurated the voting booth; prohibited electioneering within one hundred and fifty feet of the polling place; took the burden of printing and distributing ballots from the

1900.]    People ex rel. Coffey v. Democratic Com.    339

N. Y. Rep.]    Opinion of the Court, per Parker, Ch. J.

party organizations and placed it upon the public generally, and throughout teemed with provisions guarding against the frauds upon the ballot that experience had shown to be possible. Complaints had also been made that the practical effect of the power exercised by the organization was to render ineffective independent voting in purely municipal affairs, to the detriment of the best interests of the cities; and the recent constitutional convention (the work of which was subsequently ratified and adopted by the people) undertook to ameliorate the situation, to some extent, by providing that city officers should be elected at a different time than state officers, the election of the latter to take place in even, and the former in odd, numbered years, the reason assigned being that, unrestrained by national and state contests, the citizen would naturally be more independent, not only in voting, but in bringing about independent nominations whenever the party to which he belonged should attempt to make nominations intended to subserve the selfish purposes of the leaders rather than to promote the public interests.

Prior to 1882 there was no attempt to regulate by law the conduct of primaries, but chapter 154 of the laws of that year, known as the Chapin Act, declared certain acts committed at primaries crimes, such as the false personation of a voter, intentionally voting without right, prevention of others from voting, and fraudulent concealment or destruction of ballots. It also required that the presiding officers and inspectors at such an election should take the usual oath of inspectors at general elections, and provided for the challenge of voters and the administration of an oath to a person so challenged.

The act applied only to the city of Brooklyn, but in 1883 its operation was so extended as to include the entire state (Chapter 380 of the Laws of 1883), while four years later it was restricted to cities of ten thousand inhabitants or less. (Chapter 265 of the Laws of 1887.) The latter act, however, contained new provisions regulating the primary elections in all the cities of the state containing over ten thousand inhab-

**340** People ex rel. Coffey *v.* Democratic Com. [Oct.,

Opinion of the Court, per Parker, Ch. J. [Vol. 164.

itants. Among other things, it required the appointment of watchers, the examination of the ballot box before use, and that it should be so placed as to enable the voter and each watcher to see the ballot deposited, the keeping of a poll list of the voters, and the making and filing of returns in the county clerk's office. The qualifications a voter was required to possess under the Chapin Act (Section 2) and under the act of 1887 (Section 14), in addition to his being an elector, were those "prescribed by the regulations of the association holding the primary or convention."

While these provisions reduced to a considerable extent the wrongs which had been committed against the voter who desired to participate in the selection of the candidates of his party, and made snap caucuses impossible and the selection of delegates by brute force extremely difficult, still the right of the general committee to prescribe tests or qualifications for a voter was in some instances so employed as to exclude from participation in the primary many who were not in sympathy with the majority of the committee in all respects, and who might be termed members of a minority faction in the party. The not unnatural desire of the several general committees to perpetuate their power and control led, in some instances, to the making of "regulations" under which members who were not congenial to the majority were disciplined upon charges of disloyalty, inefficiency or mismanagement, and the places made vacant by their removal were oftentimes filled with men who, from choice or prudence, worked in harmony with the majority or the organization, for the latter term practically means the particular members of a party within a given territory who are, for the time being, in full control of its affairs.

In *McKane* v. *Adams* (123 N. Y. 609) it appeared that the plaintiff was formerly a member of the Democratic association of his town and a delegate upon the general committee of the county. Charges were preferred against the town association and the trial resulted in its being disbanded. A reorganization of the town association was undertaken and a primary election thereupon ordered by the general committee of the

1900.]   People ex rel. Coffey v. Democratic Com.   341

N. Y. Rep.]   Opinion of the Court, per Parker, Ch. J.

county organization, at which the defendant was elected a delegate to the county committee. The general committee refused to accept the returns of the primary election and to recognize him as a delegate. It was held that membership in such an association is a privilege which may be accorded or withheld. And such being the status of a delegate to the general committee, that body could refuse to recognize the choice of a given constituency until such time as they should conclude to elect a delegate agreeable to the wishes of the majority, thus rendering futile all attempts at independent, otherwise termed " hostile," action.

These and other abuses, as they were called by the minority members of party associations, became so common that a demand was made for a primary election law sufficiently comprehensive in scope to assure to all citizens equal rights in the primary elections, conventions and political committees of the party with which they were allied. This demand the legislature undertook to meet by chapter 179 of the Laws of 1898, which was amended (but not in respects affecting this question) by chapter 473 of the Laws of 1899. These acts recognize the equal importance of primary and general elections and model the conduct of the former upon the general lines of conduct of the latter. They provide for the enrollment of the voter, and the only exaction permitted precedent to his right to enroll is that he shall express an intention to support generally at the next general state or national election the nominees of such party for state or national offices. (Section 3, subdivision 1.) No inquiry as to the past political conduct is permitted or promise as to future support of local candidates required. They provide for booths at public expense, in which the primary voter must in secret prepare his ballot; for ballots and their printing and subsequent folding so that the inspectors shall not be able to know for whom the ballot is cast; for the administration of an oath to a voter in case of a challenge; for challengers and watchers; for an annual primary day, and that the polls shall be held open for a fixed period of time. The dominant idea pervading the entire

statute is the absolute assurance to the citizen that his wish as to the conduct of the affairs of his party may be expressed through his ballot and thus given effect, whether it be in accord with the wishes of the leaders of his party or not, and that thus shall be put in effective operation, in the primaries, the underlying principle of democracy, which makes the will of an unfettered majority controlling. In other words, the scheme is to permit the voters to construct the organization from the bottom upwards, instead of permitting leaders to construct it from the top downwards.

Now, having in mind the purpose of this statute and the decision of this court in the *McKane* case — that membership in a county general committee is a privilege which may be accorded or withheld, not a right which can be gained independently and then enforced, inasmuch as the association is voluntary, being organized without a charter and regulated as to its action by a constitution and by-laws — let us further examine the statute and see whether the legislature intended to, and did, take away from the general committee the power, for any cause whatsoever, to expel members elected thereto by the voters of a town or ward.

In the first place, the voluntary character of the county general committee has been destroyed, for the statute expressly commands that "each party *shall have* a general committee for each county." There is but one way to gain membership, says the statute, and that is through the suffrages of the members of the party exercised "at the primary elections on the annual primary day" and at "public expense." (Section 4, subdivisions 2 and 3, and section 6.)

"The expense of official primary elections, including the expense of preparing new enrollment books and the compensation herein provided to be paid to primary election inspectors, shall be paid by the same officers or boards, and in the same manner, as the expenses of general elections." (Section 4, subdivision 2.)

"There shall be two polling places in each of such primary districts which shall be designated and provided at *public*

*expense* by the officers or boards whose duty it is to provide polling places for days of general election, and which shall be, so far as they are available, the same places which were used for the last preceding general election." (Section 4, subdivision 3.)

"The polling places, voting booths, guard rails, distance markers, ballot boxes, sample ballots and other supplies required for official primary elections shall be provided and paid for by the same officers, and in the same manner, as in the case of general elections, pursuant to sections 10 and 18 of the Election Law." (Section 6.)

The term of "office" of a member of the general committee, for such the statute declares it to be, is for a period of one year, but is to commence at a time fixed by the rules and regulations of the party, except that it shall not be later than the first day of January succeeding their election. And the general committee is commanded to meet and organize "on the day fixed by the rules and regulations of the party." At that meeting a member elected at the preceding town or ward primary may appear to assume the duties of the office to which he has been elected, and the production of a certificate of election from the "custodian of primary records, or a duplicate thereof, shall be sufficient to entitle the person named therein to be admitted to the * * * committee to which he shall have been elected." Note, in passing, that there is no discretion vested in the committee, as the court said there was in the *McKane* case. The statute that calls the general committee into existence makes the certificate of the "custodian of primary records" proof of his election and right to exercise the duties of a member of the committee. And section 1 provides that "the act shall be controlling * * * on the *choice* * * * of the members of political committees and on the *conduct* of political committees in and for any political subdivision of the state." Does the recital of these provisions suggest that the legislature intended that the committee should be the judge of the election or other qualifications of its members, or that the primary voters should be the

judge ?   What was the object of the legislation — to protect the majority of the committee from enforced association with a disagreeable or " hostile " member, or to protect the right of the voters to have their wishes in party matters presented by their chosen representatives ?

If the former, then legislation was not needed in that direction, for the general committees had a method of ridding themselves of offensive members, that was in full operation, as the *McKane* case witnesseth.   If the latter was the object of the legislature, it is difficult to conceive how it could have taken more effective measures for its certain accomplishment. It provided that the statute should *control* not only the *choice* but also the *conduct* of political committees.  · The choice of the member it vested absolutely in the voter at the primary, reserving no voice whatever in the matter to his associates in the committee.   It provided many things for the conduct of the committee, but the right to expel a member was not one of them.   Power was given to a committee to prevent a member who had failed to pay his annual dues " from participating in the meetings of such committee."   Expulsion from, or forfeiture of, his office was not named as the penalty for non-payment of dues, but only exclusion from participation in the meetings. And it is apparent from a reading of the provisions that the words were chosen with a view of enabling the member to resume attendance of the meetings upon payment of dues. But if this provision were capable of being treated as authorizing expulsion for non-payment of dues, the maxim *expressio unius est exclusio alterius* would be applicable and call for a construction of the statute denying power to expel a member of the committee for any other reason.

But, to resume again the inquiry we were pursuing, whether it was possible for the legislature to have employed language more apt than it did to absolutely vest the power in the voters at the primary to select a representative in the general committee who should be responsible to them alone for the manner in which he should conduct himself, we observe, in addition to the provisions that the statute should control not only

the choice, but the conduct, as well, of the committee, that the details of the plan by which the choice is to be made by the primary voter are fully carried out and every one of them support in some measure the absolute supremacy of the majority at the primary. The annual enrollment; the statutory qualification of the voter; the private booth; the secret ballot and all the expensive machinery of a general election to be paid for out of the public treasury — why was it all required if the legislature intended to permit the majority of the committee to deprive the primary voters of the right of choice on any ground whatsoever? But it did not so intend; and, in the light of the abuses that the legislature set out to remedy, upon any possible reading of this statute there seems no room whatever for the contention that the right of removal for any cause was continued in the statutory general committee that now takes the place of the voluntary committee of other days.

If I am right in the views expressed, no other question need be considered, for the statute manifests an intent not.to allow the committee, on any pretext whatever, to remove the committeeman from office, and it is the duty of this court to give full force and effect to that legislative intent.

It has been suggested that it would be intolerable for the members of a general committee to associate with a member who is hostile to the ticket, and that it follows that the legislature must be presumed to have had such a situation in mind. I answer — without assenting for one moment that the legal conclusion follows from the proposition of fact standing alone — that it does not stand alone; that the legislature was confronted with what it regarded as an abuse of the rights of the citizens in party matters, which compelled it to decide which was the lesser of two evils, to compel association occasionally with a member who is hostile to some portion of the party candidates or a majority of the committee, or to permit the general committee to deprive the primary voters of the choice of a representative. It decided that the wrongs that

44

had been and were being done to the primary voters exceeded
that which could result from occasional association with a hos-
tile member.  In other words, it was determined that the
majority of the primary voters were entitled to select any rep-
resentative they might desire, who should be responsible to
those electing him, and only to them, for his conduct in office.
That determination should be given effect by the decision of
this court agreeably to that well-understood canon of construc-
tion that commands the court in construing a statute to give
effect to the intention of the legislature.

The suggestion that the provision of section 9, subdivision
1, requiring the general committee to meet and organize and
authorizing the making of rules and regulations, but provid-
ing that unless rules be so adopted " the rules or regulations
adopted by the last preceding county or general committee of
said party in said county shall remain in full force and effect
until repealed or amended in accordance with the provisions
of this act," continues in force all the old rules and regula-
tions, including those permitting the expulsion of members
for the violation of rules, might furnish sufficient foundation
for a controversy, notwithstanding the fact that such rules
would be in open conflict with both the manifest purpose and
clear reading of the statute, were it not that the opening pro-
visions of subdivision 2 of the same section expressly so limit
the effect of rules and regulations as that they shall not be
inconsistent with the provisions of the statute.  · It reads as
follows : " The rules and regulations of parties, and of the
conventions and committees thereof, shall not be contrary to,
or inconsistent with, the provisions of this act, or of any other
law."  If, therefore, the defendant were acting under the
rules and regulations of its predecessor association (of which
there is no hint in the record), so much thereof as provided
for the trial and removal from office of a member of the com-
mittee has neither force nor effect, because contrary to and
inconsistent with the provisions of this act.

The order of the Appellate Division should be reversed and
that of the Special Term affirmed, with costs.

CULLEN, J. (dissenting). It is practically conceded by the prevailing opinion that if there was any power in the general committee to expel the relator for cause, then, on the affidavits submitted by the parties, the application for a peremptory writ of mandamus should have been denied, whatever might have been the relator's rights, had he asked for an alternative writ. The sole question, therefore, necessary to be discussed on this appeal is whether there is power in the general committee of a political party to expel a member for misconduct in the member's duty to the committee, disloyalty or other cause.

I agree with the opinion of the learned Appellate Division that there is in the general committee for self-protection an inherent power to expel a member acting in hostility to the objects and purposes for which the committee was organized. It is not necessary that the power should be granted by the statute in terms ; it will be presumed to exist unless the statute has denied it. The power of amotion or removal of members is said by Chancellor KENT to be an ordinary incident of a corporation. (II Com. 278.) In *People ex rel. Bartlett* v. *Medical Society* (32 N. Y. 187) it was said : " We entertain no doubt that the county societies may still exercise the common-law power of expulsion, notwithstanding the remedy provided by statute which we regard as merely cumulative." In *People ex rel. Pinckney* v. *Fire Underwriters* (7 Hun, 248) it was said of the powers of the corporation then before the court : " It was merely an organization formed for promoting the proper transaction and management of the business of insurance, by its members, in a uniform manner. And its usefulness and success depended, in a very great measure, upon their faithful observance of its rules and regulations. That, under the charter, was an implied condition of membership, for the organization could be no otherwise maintained. And, for that reason, the corporation necessarily possessed the power of expulsion over members violating their obligations in that respect. It could not exist without it." This is not the rule as to stock corporations but it applies to all corporations or voluntary associations where

there exists a personal duty of the member to the corporation or association.

Why should not the same rule apply to the general committee of a political party? The members of that committee are certainly not public officers, for this reason, if for no other; public officers must, under the Constitution, be either appointed or elected, and if elected, then in the same manner as other elections by the people. (Const. art. X, sec. 2; *Matter of Gage*, 141 N. Y. 112.) They take no official oath. They cannot be indicted and removed for misconduct in office. It is difficult to imagine a case where the obligation of the member to the association is more purely ethical or more devoid of any legal attributes possible to be enforced by the courts. The political convictions of a member may change subsequent to his election and he may conscientiously desire the defeat of the party to which he has belonged. He may think that in no way can he accomplish that result more effectually than by remaining as a leader to share in the counsels and control of the party. Is the committee to be relegated to the chance of the member's sense of delicacy dictating his resignation, as the sole means of severing its connection with him? Is a county committee of the Prohibition party to be denied the right to exclude from its counsels a member who, subsequent to his election, engages in the manufacture or sale of intoxicating liquors, or has so little regard for his political principles as not to remain sober for a week at a time? It is said that the power of the general committee to expel members is not to be presumed because if it exists it may be abused. This is true of the exercise of all power. The question whether the relator was properly removed from his position does not arise on this record; if wrongfully removed, he may obtain redress in a proper proceeding and by proper averments in his petition.

The question discussed is all that is necessarily involved in this case, and I would rest here were it not for the annunciation in the prevailing opinion of certain propositions from which I feel bound to express my dissent. It is asserted that

1900.]   People ex rel. Coffey *v.* Democratic Com.   **349**

N. Y. Rep.]        Dissenting opinion, per Cullen, J.

the organization and control of a political party are no longer
matters of voluntary agreement among the members of that
party, but that, under the statute relating to primary elections,
every party must have a county committee and that commit-
tee must be appointed and organized in the particular way pre-
scribed by the statute.    This doctrine is made the foundation for
the argument that the legislature meant to deprive the general
committee, or party organization, of all power, except such as
the statute gives in express terms.    From this doctrine I dis-
sent *toto coelo*.    If the statute is to be so construed, in my
judgment, it is unconstitutional and void.    The right of the elec-
tors to organize and associate themselves for the purpose of
choosing public officers is as absolute and beyond legislative
control as their right to associate for the purpose of business
or social intercourse or recreation.    The legislature may, doubt-
less, forbid fraud, corruption, intimidation or other crimes in
political organizations the same as in business associations, but
beyond this it cannot go.    Much is said of the evils that have
grown up in the management of political parties and the dicta-
tion that has been exercised by political leaders and their inva-
sion of the rights of the members of a party, and it is asserted
that the statute intended to secure to all citizens equal rights
in the management of the parties to which they may be allied.
But an alliance cannot be made by one person alone.    It
requires the action of several whose rights are equal; no one
can ally himself with others solely by his volition.    Therefore,
I do not see that an elector has any greater right to join a party
unless on the conditions that the party prescribes, than he has
to insist upon entering a partnership on contributing his
quota of capital, against the wish of the parties then conduct-
ing the business.    In *People* v. *Gillson* (109 N. Y. 389) it
was held that a statute prohibiting any gift on the sale of any
article of food, or any other article, as an inducement to pur-
chase, was unconstitutional and void, in that it infringed upon
the liberty of the dealer to pursue a lawful calling in the man-
ner he chose to adopt.    The liberty of the electors in the exer-
cise of the right vested in them by the Constitution to choose

public officers on whatever principle or dictated by whatever motive they see fit, unless those motives contravene common morality and are, therefore, criminal, cannot be denied.   It seems to me as absolute as the right to pursue any trade or calling, and, therefore, their right to associate and organize for that purpose is equally great.    The statute of primary elections grants the right to join in the management of a party to any person on a declaration of his intention to support generally the candidates of that party, but a political organization may be unwilling to grant membership on these terms.    It may make past conduct, and not future promise, the condition of membership.   If the legislature can prescribe this test as a condition of membership in a party, I do not see why it may not require as a condition of voting at a Democratic primary a declaration of belief in the free coinage of silver at the ratio of sixteen to one, or of membership in the Republican party a denial of the application of the Constitution of the United States to the territories and dependencies of the country. Whether these are the fundamental doctrines of these parties, I do not attempt to say.   If they are, it is for the parties themselves to so declare, not for the legislature.    The rules and principles on which political parties are to be conducted must necessarily lie largely beyond the domain of legislative interference, because they relate to the action of the people, the ultimate source of sovereignty in what is unquestionably their prerogative, the election of public officers.   It may be that what is apparently the present practice of the voters, the subordination of the choice of municipal and local officers to the partisan tests of national political parties, is an evil and leads to bad government.    It may also be that the blind obedience of the electors in voting for the nominee of some political leader is a great evil and leads to corruption.    As a public officer I have no opinion to express on these questions, though as a citizen I have a very positive judgment thereon.   It may be that the voters think it is necessary to choose local officers on party lines for the purpose of maintaining their party organization and ultimately succeeding in the control of the government,

state or federal, on larger issues which they deem more import-
ant than local contests, and they may vote for nominees selected
by political leaders because of implicit faith in the wisdom and
integrity of those leaders. Of course it is equally possible
that they are guided by no such reasons; but all this is some-
thing with which the legislature has no right to interfere,
because in these matters the people are supreme. The legis-
lature may doubtless, to a certain extent, affect the subject by
providing for the conduct of elections in such manner as to
render independent voting easy; but this is the extent of its
power. The evil in all these things comes from the voluntary
acts of the voters themselves; and can be corrected only by
arousing the consciences of the electors to their responsibilities
and duties. A rule which would permit interference with
the liberty of an elector in his political action cannot be
upheld, no matter how meritorious its object may be in a par-
ticular case.

I think the statute of primary elections can be sustained,
however, where political parties voluntarily take advantage of
it, that is to say, political parties may have their organizations
and primaries outside of the statute if they choose; but, if
they adopt the statutory primaries held at public expense, they
become subject to statutory rules. This admission does not
render the views expressed as to the power of the legislature
to control political organizations irrelevant to the discussion of
this case; for, if the subjection of the political parties to the
provisions of the statute is voluntary, we may assume that the
legislature did not intend to deprive party organizations of
powers that they formerly had and seem almost necessary
to their practical administration; powers which they would
not be likely to surrender even for the advantage of holding
their primaries at public expense. In analogy to the case of
a corporation the ground for the expulsion of a member must
be a cause arising since his election, at which time first comes
into being the duty of the member to the committee. (*People
ex rel. Pinckney* v. *Medical Society, supra; Fawcett* v.
*Charles,* 13 Wend. 477.)

The order appealed from should be affirmed, with costs.

HAIGHT, VANN and LANDON, JJ., concur with PARKER, Ch. J., for reversal; O'BRIEN J., concurs with CULLEN, J., for affirmance; and BARTLETT, J., concurs in result reached by CULLEN, J.

Order reversed, etc.