R. E. WHEELER, JAMES D. BURBRIDGE, E. E. WEST, B. S. CATLETT, TOM R. TODD, CHAS. BLUM COMPANY, O. L. WADSWORTH AND ROBERT W. SIMMS, *Appellants*, v. L. L. MEGGS, D. C. BROWN, S. A. MARSHALL, W. H. EUBANKS AND ORISON J. PICKETT, COMPOSING THE BOARD OF COUNTY COMMISSIONERS OF DUVAL COUNTY, FLORIDA, AND FRANK M. IRONMONGER; AS SUPERVISOR OF REGISTRATION OF DUVAL COUNTY, FLORIDA, *Appellees.*

Opinion filed May 13, 1918.

1. Under the provision of the constitution that the Supreme Court shall have the power to issue "all writs necessary or proper to the complete exercise of its jurisdiction," the Supreme Court should not, assuming that it has the power to do so, in a case on appeal, enjoin the holding of a local option election when an injunction has been refused by a circuit judge, unless it clearly appears that the election has been called in violation of law and that no other adequate remedy is afforded by law.

2. The provisions of the constitution should be interpreted with reference to their relation to each other unless a different intent is clearly manifest.

3. A "primary election" by qualified electors who are members of a political party, to elect party candidates and committeemen and delegates under the statute, is not a "State election" to choose officers by any or all electors qualified under the constitution.

4. It is not clear that the organic provision that no local option election shall "take place within sixty days" before "any State or National election," has reference to a statutory "primary election" to nominate party candidates for office, &c., as well as to a "State election" to choose officers.

5. It does not clearly appear that the irregularities and illegalities complained of in the proceedings for calling the local option election will render the election invalid.

Original jurisdiction.

Application denied.

*Alex. St. Clair-Abrams,* for Appellants;

*Don Register, A. W. Cockerell, F. P. Fleming, H. P. Adair* and *Frank E. Jennings,* for Appellees.

WHITFIELD, J.—Appellants brought suit to enjoin the holding of a local option election called under Article XIX of the Constitution and Sections 1209, *et seq.* Gen. Stats., to take place in Duval County May 14, 1918, pursuant to a call made by the County Commissioners on April 10, 1918, the grounds for equitable relief being certain alleged irregularities and illegalities in the proceedings for calling the election and also an allegation that if the election is held on May 14, 1918, it will take place within sixty days before the primary election to be held June 4, 1918, in violation of the constitution and statutes which provide that such local option elections "shall be held within sixty days from the time of the presenting of said application, but if any such election should thereby take place within sixty days of any State or National election, it shall be held within sixty days after any such State or National election." Sec. 1 Art. XIX Constitution. Sec. 1212 Gen. Stats., Compiled Laws, 1914.

The circuit judge denied the injunction, the complainants appealed and have applied to this Court for an extraordinary writ or order enjoining the holding of the local option election on May 14, 1918, pending the dispositon of the appeal herein taken. See Jacksonville Electric Company v. Jacksonville, 36 Fla. 229, 18 South. Rep. 677.

The Constitution provides that "The circuit courts shall have exclusive original jurisdiction in all cases in equity," and that "the Supreme Court shall have appellate jurisdiction in all cases in equity originating in circuit courts" and "shall have power to issue * all writs necessary or proper to the complete exercise of its jurisdiction." Secs. 5 and 11 Art. V Constitution.

Under the provision of the constitution that the Supreme Court shall have the power to issue "all writs necessary or proper to the complete exercise of its jurisdiction," the Supreme Court should not, assuming that it has the power to do so, in a case on appeal enjoin the holding of a local option election when an injunction has been refused by a circuit judge, unless it clearly appears that the election has been called in violation of law and that no other adequate remedy is afforded by law. See Cohen v. L'Engle, 24 Fla. 542, 5 South. Rep. 235.

Wherever the word "election" appears in the constitution of 1885 other than in Article XIX, it has reference to the election held under the constitution biennially in November for choosing state and other officers; and there is no reference in the constitution to elections for choosing party candidates for office to be voted for at the election provided for in the constitution. And the statutes of the state then made no provision for elections to nominate party candidates for office.

Article XIX ordains that no local option election provided for therein shall "take place within sixty days" before "any state or national election." The statute of 1887 merely restates the organic provision. Sec. 1212 Gen. Stats. 1906, Florida Compiled Laws, 1914.

The provisions of the constitution should be inter-

preted with reference to their relation to each other unless a different intent is clearly manifest.

The statute of 1913 provides for "pri.ary elections" in June to nominate party candidates to be voted for at the state elections held in November under the constitution, and to elect party committeemen and delegates.

A "primary election" by qualified electors who are members of a political party, to elect party candidates and committeemen and delegates under the statute, is not a "state election" to choose officers by any or all electors qualified under the constitution. See 124 Pac. 554. Even if the considerations that prompted the provision forbidding a local option election to be held within sixty days before a state or national election are applicable to a primary election, this fact would not of itself justify a judical extension of the restrictive words "any state or national election" used in Article XIX of the constitution. The provision was not specifically extended to conventions for the nomination of party candidates and for the selection of party committeemen and delegates which were in vogue when the constitution was framed. The legislature has substituted primary elections for conventions in the nomination of party candidates for office and for the selection of party committeemen and delegates, but it has not interpreted the organic provision as including "primary elections," as it merely uses the language of the constitution, viz: "any state or national election." Sec. 1212 Gen. Stats.

The sale of intoxicating liquors, wines or beer under a license is subject to be terminated by a majority vote against such sale in a local option election duly held under Article XIX of the constitution.

It is not clear that the organic provision that no local

option election shall "take place within sixty days" before "any state or national election," has reference to a statutory "primary election" to nominate party candidates for office, &c., as well as to a "state election" to choose officers. See 123 S. W. 473; 124 Pac. 554. If a "primary election" to nominate party candidates is a "state election" within the meaning of the constitution, the provisions of the constitution applicable to state elections may affect the validity of the primary election law, Chapter 6469 Acts of 1913. If the primary election law is invalid it does not affect the time for holding the local option election.

The statute affords a remedy in providing that a local option election may, at the suit of any resident of the county, be decreed to be null and void if illegally held. Sec. 1216 Gen. Stats.

The appellants' portion of the expense of holding a local option election may not of itself afford an equity as against all the tax payers and the public, who are represented by the appellees, to enjoin the holding of the election when it does not clearly appear that the election will be held in violation of law. If the election is legal and forbids further sales of intoxicating liquors, the appellants are not entitled to relief. If the election is legal and does not forbid sales of liquor in the county, the appellants are not injured. If the election is illegally held it may "be adjudged to be illegal and void" at the suit of any resident of the county in the statutory proceeding, the mere delay in the statutory remedy not of itself affording an equity for injunction, it not being clear that holding the lection will be unlawful. Enjoining a legal election irreparably injures the public.

Upon a consideration of the entire transcript it does

not clearly appear that the irregularities and illegalities complained of in the proceedings for calling the local option election will render the election invalid.

The application is denied.

ELLIS AND WEST, J. J., concur.

BROWNE, C. J., AND TAYLOR, J., dissent.

BROWNE, C. J., dissenting—I cannot concur in the decision of the majority of the court, because I am firmly convinced that the Constitution of Florida, prohibits the holding of a local option election within sixty days of a primary election.

Article XIX contains this clause: "Elections under this section shall be held within sixty days from the time of presenting said application, but if any such election should thereby take place within sixty days of any State or National Election it shall be held within sixty days after any such State or National Election." The purpose of this provision is apparent. It is to prevent the voters and candidates in a State-wide election from being influenced, controlled or affected in any degree by the contending parties and influences of a local option election and the passions engendered thereby. This provision is but one of many found in the Constitution and Laws of all the States whose purpose is to accomplish that without which governments would be no longer free, the voluntary expression of the will of the people in the selection of their officers, uncontrolled by passion or extraneous considerations.

The framers of the Constitution were not unmindful nor unadvised of the powerful influence that could be

exerted over voters and candidates alike by the contending factions in a local option election, and it was to free them from such influence that this clause was written in the Constitution. At that time there were two political parties contending for supremacy in Florida and the power of the liquor people or their opponents, might have become the controlling factor in the result of an election if the two were held near enough together so that the passions engendered by one could affect the result of the other.

Primary elections regulated and controlled by law did not then exist in Florida, but the Constitution which is a declaration of fundamental principles,—by the use of the term "any State or National Election"—laid down the rule with sufficient broadness to include any election of State-wide operation that might thereafter be provided for by the State, or by the Congress of the United States. At the time the Constitution was adopted, a State Election in Florida held at any other time than on the day of a National Election, was as unknown as a primary election, but the framers knew that with the passage of the years elections that they then knew not of, might and probably would be provided for, and they stated the prohibition against holding a local option election in the alternative, and used the language "any State or National Election." As State and National Elections in Florida had always been held on the same day, the framers must have had in contemplation elections in addition to these.

Is the expression of the will of the people that is to take place on June 4th an election?

The word election is not limited to the selection of officers, but relates to the determination of any public

question by ballot. Among the definitions given in the Century Dictionary, I find these: "A public vote on a proposition submitted," and "Election in a political sense was formerly limited to 'the act of choosing a person to fill an office or employment,' the new sense includes a voting at the polls to ratify or reject a proposed measure, or to make a choice between persons for any political purpose."

The New Standard Dictionary defines it: "(1) The act or proceeding of selecting a person or persons for office or employment, especially by vote by ballot or otherwise; (2) a popular vote on a question of public policy or interest."

Webster among other definitions gives: "The act of selecting one or more from others; the act of choosing a person to fill an office or employment by any manifestation of preference."

From these definitions it seems quite clear that it is an election. It is "a popular vote on a question of public policy or interest," and it is also "the act or proceeding of selecting a person or persons for office or employment" because not only are party candidates selected to be voted for at the next election, but it selects appointive officers, and while such selection is not mandatory on the Governor, it in effect determines who the incumbent will be, and it *"elects"* State, Congressional and County Committee men.

The great electorate of Florida not only considers and calls the primary an election, but by many it is regarded as final, and by all it is held in greater esteem and reverence than the General Election. To say that it is not an election, is to go counter to the weight of the authorities, the definitions of the lexicographers, and the recognized opinion of the people. I would find great

difficulty in convincing the voters of Florida that our primary election is not an election.

If, however, these reasons are not conclusive, we need only refer to the primary law itself, which in terms provides for the *"election"* of persons to fill certain positions; Section 1 Chapter 6469, Act of June 3rd, 1913, the law under which the election will be held on June 4, provides: "The Nomination of all Candidates for all Elective State, Congressional and County Offices, for United States Senator, and for the *election* of Members of the State, Congressional and County Executive Committees, by all Political Parties as Defined by this Act, shall be made in the manner Provided in this Act, and not otherwise."

Here is a clear discrimination of two distinct subjects; "the *nomination* of all candidates," and "the *election* of members of the State, Congressional and County Executive Committees."

Section 7, provides in part: "The State Executive Committee shall consist of one member from each County in the State, who shall be *elected* for two years at the primary held in the year 1914, and every two years thereafter," and the same provisions are made for the *election* of Congressional and County Committeemen.

Similar statutes in New York and Missouri providing for the election of committeemen of political parties, have been construed by the courts of last resort in those States. In the case of People *ex rel.* Coffey v. Democratic General Committee, 164 N. Y. 335, 58 N. E. Rep. 124, Mr. Chief Justice ALTON B. PARKER, who delivered the opinion of the majority of the court, in discussing the necessity for laws to insure the purity of primary elections, said: "The settled conviction that the safe-

guarding of our institutions requires the untrammeled exercise of the franchise by the citizens."

This is peculiarly applicable to the situation with which we are confronted, and should make us pause before we say that the constitutional prohibition against holding a local option election within sixty days of a State election does not apply, and that there is not the same necessity for the "untrammeled exercise of the franchise" in a primary election as in the General Election.

The case under consideration by the New York Court was one where the Democratic Committee of Kings County expelled one of its members for "alleged disloyalty and open hostility to the Democratic party," and he sought by mandamus to require it to resore him to all his rights and privileges as a member of the committee.

Judge PARKER begins his opinion with this language: "The fundamental question in this case is whether a member of the general committee of a county may be removed *from office* as a member of the committee."

I quote again from his opinion: "It has been suggested that it would be intolerable for the members of a general committee to associate with a member who is hostile to the ticket, and that it follows that the legislature must be presumed to have had such a situation in mind. I answer—without assenting for one moment that the legal conclusion follows from the proposition of fact standing alone—that it does not stand alone; that the legislature was confronted with what it regarded as an abuse of the rights of the citizens in party matters, which compelled it to decide which was the lesser of two evils, to compel association occasionally with a member who is hostile to some portion of the party can·

didates or a majority of the committee, or to permit the general committee to deprive the primary voters of the choice of a representative. It decided that the wrongs that had been and were being done to the primary voters exceeded that which could result from occasional association with a hostile member. In other words, it was determined that the majority of the primary voters were entitled to select any representative they might desire, who should be responsible to those *electing* him, and only to them, *for his conduct in office*. That determination should be given effect by the decision of this court agreably to that well-understood canon of construction that commands the court in construing a statute to give effect to the intention of the legislature."

It will be observed that Judge PARKER in both these citations and throughout his opinion speaks of committeemen chosen in a primary as having been elected to an office, and that members of a party committee are *quasi* officers to whom a peremptory writ of mandamus will issue. Against the clear positive declaration and sound reasoning of so eminent a jurist and distinguished statesman as Judge PARKER, I am reluctant to pit my opinion, and am inclined to accept his view unless I can demonstrate by the strongest and most cogent reasoning that he was clearly wrong. This I am unable to do.

The question that was involved in People *ex rel*. Coffey v. Democratic General Committee, *supra*,—the right to compel by mandamus a political committee elected in a primary election to restore to membership one whom they had expelled,—later came before the Supreme Court of Missouri, in State *ex rel*. Guion v. Miles, 210 Mo. 127, 109 S. W. Rep. 595, and the majority of the court adopted Judge PARKER's reasoning. After quoting freely from his opinion that court said: " We are unable

to agree with learned counsel upon this proposition. As heretofore stated, we deem it immaterial what name should be attached to the position of a membership of the general committee of the City of St. Louis. If the duties imposed upon the committemen are of a public nature and concern the public then in our opinion his position should be classified at least either as a public officer or a *quasi*-public officer, or a position analogous to that of a public officer. * * * So we say in this case; it makes no difference whether or not the relator is denominated a public officer; under the law of this State he is elected to fill a public positon and to perform duties of great public concern; therefore, his position is one at least analogous to that of a public officer."

The provisions of the New York, the Missouri and the Florida laws on the subject of the election of party committeemen are almost identical. The similarity between the New York and the Missouri Statutes is pointed out in State *ex rel.* Guion v. Miles, *supra,* and the court invokes the doctrine that when a statute is adopted by the legislature of another State, the construction placed upon it in the first State prior to its adoption in the second, will be presumed to have met with the approval of the legislature when adopting it. On this point it was said in the Miles case *supra,* "Recurring to the propositon as to whether the General Assembly of this State in the enactment of our statute approved the construction as placed upon the statute of New York from which .ours in the main had been borrowed, it must not be overlooked that it is not essential, in order to fall within the rules announced in the cases heretofore indicated upon that proposition, that the statute adopted in this State should be a literal copy of the one from the foreign State, but it is only neces-

sary to bring it within the rules as heretofore suggested that the substance of a statute or so·ɪ e controlling word has been borrowed from such foreign State and adopted by the Legislature of this State."

The provisions of Section 7 of the Primary law with regard to the election of State, Congressional and County Committeemen are in substance the same as those of ˙New York and Missouri, and when the legislature of Florida enacted those provisions, it had before it the construction placed on them by the New York Court of Appeals and the Missouri Supreme Court, both of which had decided that persons elected in a primary election to a position on a State or County committee, were charged with public duties, and were *quasi*-public officers.

In Wisconsin the doctrine is extended not only to those whom the law says "shall be elected," but also to those who are chosen as candidates. Thus in State *ex rel*. Rinder v. Goff, 129 Wis. 668, 109 N. W. Rep. 628, it was said: "The primary election law was a new and important law, operative in every election precinct and county of the State, making a radical change in the conduct of all general and municipal elections, and creating a new office of quasi-office, namely, the office of nominated candidate. Although this new office or right was one of very short duration and carried but one privilege, namely, the privilege of having the name printed properly on the official ballot, nevertheless the right was important." I cite this case, not as authority for my conclusion, but to illustrate the tendency of the courts to go to any limit to place primary elections in the same class with other elections.

We must next determine whether the election to be

held on June 4th is a "State Election" or not. It is not a county, or municipal election, nor is it a local or special election. It is State-wide; it must be held in every county in the State on the same day; registration in the entire State is provided for by law, the result of which must be furnished the Secretary of State, who is required to print the registration books; assessments made by State Executive Committees are required to be filed with the Secretary of State; a candidate who is to be voted for in the entire State must pay his filing fee to the Secretary of State; a State compaign book is issued by him; he is empowered to employ clerical aid to assist in the performance of his duties in connection with the primary election, who are paid out of the Treasury of the State; the returns are canvassed by the State Canvassing Board which is composed of "the Secretary of State, the Comptroller, and the Attorney General, or any two of them, together with any other administrative officer of the Executive Department who may be designated by them," and they "shall meet at the office of the Secretary of State;" the expenses of the election are paid out of the Treasury of the County or State in the same manner with like effect and by the same officers as in the case of General Elections; all the taxable property in the State bears its part of the burden of paying the expense of the election.

The majority of the court having conceded that the primary election is an election, the conclusion seems irresistible that it is a State Election. Geographically, politically, financially and potentially it is a State function and it not only comes within the term "State Election," but cannot aptly be designated by any other.

A provision similar to ours for the payment by the

State of part of the expenses of a primary election, has been passed on by the Supreme Courts of Texas and Louisiana, and although they reach a different conclusion, the reasoning in both supports my contention that the primary is a State Election. In Waples v. Marrast, Tex.    , 184 S. W. Rep. 180, the provisions of the law for the payment of the expenses of a primary election out of the public funds, were held unconstitutional on the theory that a primary election served no governmental purpose, and that it is no part of the business of the State to aid in providing nominees of political parties. In this case the court said: "General elections are essential to the public welfare and are distinctly related to the discharge of an important governmental duty, because it is only by their means that the organic law may be amended and in the elective offices public officials be supplied for the various administrative agencies of the State. But is it any duty of the State to provide the people with nominees of political parties for the elective offices of the government? Is it in any just sense a concern of the State, that those offices be filled by only the nominees of political parties? And is there any right in the State to devote the public revenue of the State derived by taxation from the people at large in aid of the purposes of such parties? * * * The great power of the State, and the taxing power is the one to be always the most carefully guarded,—cannot be used in our opinion, in aid of any political party or to promote the purposes of all political parties. They are no more to be made the objects of governmental bounty or favor than any other class of public organizations into which groups of citizens may form themselves. Expenses incurred in the furtherance of their objects can no more be defrayed out of the public treas-

ury than the expenses of other associations of individuals."

The constitutionality of the provisions of our primary law for the payment of the expenses of the primary election out of the public funds of the State, can only be sustained upon the theory a primary election is not a mere party matter, but is for the public welfare in discharge of an important governmental duty. If it be not, there is no warrant for the expenditure of the funds of the State to carry on the election.

Although the Democratic party is the only one that has availed itself of the provisions of the primary election law, it is not a partisan measure, as the elections of "all political parties" are regulated thereby.

This court in the case of State ex rel. Knott v. Haskell, 72 Fla. 176, 72 South. Rep. 651, said: "The demand for Primary Elections arose from distrust of representative government and the need for pure democracy. In this spirit the Primary Election law was enacted." It was a State demand, for a State institution, and that institution being an election, ergo it is a State election.

In the case of State ex rel. Labauve v. Michel, 121 La. 371, 46 South. Rep. 430, the court had before it the same provision of law as that presented in the Texas case, supra, and in sustaining the right of the State to pay the expenses of a primary election, because it was a State institution said: "The next three grounds are to the effect that, the primaries being the mere private affairs of the political parties, the public moneys cannot be used for contributing towards the payment of their expenses. The answer to these grounds is that the primaries are not the private affairs of the political parties, but State-regulated elections, part of the election machinery of the State."

Recurring to our constitution, I find that it deals with "General Elections," "Special Elections" and "Election of Offices," but Article XIX in specifying a time within which a local option election shall not be held, uses the comprehensive term "Any State or National Election." The majority of the court construes the term "Any State or National Election," to mean the General Election. To adopt this construction is to ignore the distinction contained in Article XIX itself. Thus, it says that a local option election "shall be conducted in the manner prescribed by law for holding *General Elections*," and in the next sentence it says "but if any such election should thereby take place within sixty days of any State or National Election, it shall be held within sixty days after any such State or National Election." Why the use of the term "General Election" in one place, and "any State * * * Election" in the very next sentence, if the latter term was intended to include only the former?

Section 3813 of the General Statutes of 1906, provides: "All bar-rooms, saloons and other places for the sale of liquor by retail, shall be closed at 6 o'clock of the evening preceding the day of any election, and shall remain closed until 6 o'clock in the morning of the day thereafter. And during the time aforesaid, the sale of all intoxicating liquors is prohibited."

Under this provision of the law bar-rooms are required to be closed from "6 o'clock of the evening preceding the day of *any election*," and to "remain closed until 6 o'clock in the morning of the day therafter." The quoted part of Section 3813, is taken verbatim from Section 59, of Chapter 4328, Acts of 1895. The title of this Act is: "AN ACT to Provide for the Registration of all Legally Qualified Voters in the Several Counties

of the State, and to Provide for General and Special Elections and for the Return of Elections."

Thus the provisons of AN ACT to provide for "General and Special Elections," have since 1895 been construed by the Executive branch of the government; to apply to Primary Elections, and this construction has been acquiesced in by the Legislature and the people for over twenty-three years.

The majority of the court hold that the term "any State or National Election" refers only to the "General Election" and not to the State Primary Election. The accepted construction placed on Chapter 4328, Acts of 1895, is that the provisions of an Act "to provide for General and Special Elections," apply to State Primary Elections. These constructions are irreconcilable.

It is contended that because primary elections were unknown to our law when Article XIX was adopted, the framers of our constitution could only have had in contemplation such elections as they provided for in that document. To limit a constitutional prohibition to conditions existing at the time a constitution is adopted would soon cause it to become an obsolete document,— a husk without meat. Constitution makers seek to lay down fundamental principles broad enough to apply to and govern changing conditions and developments which the wisdom of the framers know will necessarily occur.

In the case of Johnson v. Grand Forks County, 16 N. D. 363, 113 N. W. Rep. 1071, the court said: "it is contended that the primary election authorized by the law under consideration is not such an election as was contemplated by the framers of the constitution. In other words, that it is not a constitutional election, and that, therefore, it is not governed by the constitutional limitations. We cannot agree with this contention. Section

121 of the Constitution prescribes the qualifications for voters at 'any election.' It is true that at the time of the adoption of the Constitution a primary election law was unknown in this State, but constitution makers are not presumed to foresee and take into consideration every new condition which may arise or every new remedy which may be devised for application to old conditions. Constitutions do not deal in details. They comprise general principles and general directions which are intended to apply to all new facts and conditions which may come into being, and which may be brought within the terms of these general principles or directions, and when the constitution says 'any election,' in prescribing the qualifications of voters, it does not mean simply any election then known to the people of the State. It means, not only any election then provided for by the laws and constitution, but any election which may thereafter be established or required to be held pursuant to law. This principle has been recognized by numerous courts. The Constitution of the State of California provides the qualifications necessary to entitle a person to vote at elections 'authorized by law,' and in Spier v. Baker, 120 Cal. 370, 52 Pac. Rep. 659, the court holds that primary elections thereafter provided for are elections 'authorized by law,' and says that any infringement by the legislative power upon the right to vote as granted by the constitution is idle legislation, and that any attempt of this kind is an exercise of power it does not possess. In the same case the court says: 'It must be an election under this provision of the Constitution, or the legislature would have no power to provide that money should be taken from the State and county treasuries to pay the expenses of conducting it. The validity of any taxation looking towards the raising

of money for such purposes would be absolutely void if the elections provided for by the Act are not elections recognized by and referred to in this constitutional provision. These things being true, the Legislature has no power to deprive any citizen of the State who fills all the requirements demanded by the section of the constitution quoted from voting at an election provided for by this Act.' In People *ex rel.* v. Board of Election Com'rs. of City of Chicago, 221 Ill. 9, 77 N. E. Rep. 321, the Supreme Court of Illinois held that, although at the time the Constitution was adopted primary elections as such were not within the contemplation of the convention or the people, and had not been made a part of the election system, yet that the primary election subsequently provided for by the law was an election within the meaning of that word as used in the Constitution. To same effect, see Leonard v. Commonwealth, 112 Pa. St. 607, 4 Atl. Rep. 220."

In People *ex rel.* v. Board of Election Com'rs. of City of Chicago, 221 Ill. 9, 77 N. E. Rep. 321, the court said: "It is undoubtedly true that, at the time the Constitution was adopted, primary elections, as such, were not within the contemplation of the convention of the people, for the reason that up to that time they had been made part of the election system or subject to regulation law. At that time candidates for office were nominated by means of the caucus and convention of delegates, and such nomination were purely private affairs of the political organization. Since that time there has been a considerable extension of the election system. * * * The Act of 1905, which is now under consideration, makes further extensions and regulations for choosing candidates whose names shall be printed on the official ballot, and the legislation is or the same character as the ballot

law. All these acts relate to the same subject, and in combination are designed to constitute a single and harmonious system under which the people may exercise the elective franchise and make their choice between the candidates for public offices. They all relate to elections, and are within the meaning of that word as used in the Constitution.

"It seems clear that the elections protected by the constitution are all such elections as are held under authority of law, at which qualified electors may vote; and when statutes are enacted which regulate the form of the ballot to be used, what shall appear upon the ballot, and how the candidates whose names shall so appear shall be chosen, the provision of the Bill of Rights applies to the new condition. The right to choose candidates for public offices whose names will be placed on the official ballot is as valuable as the right to vote for them after they are chosen, and is of precisely the same nature. There is scarcely a possibility that any person will or can be elected to office under this system unless he shall be chosen at a primary election, and this statute, which provides the methods by which that shall be done and prescribes the limits the right of voters and of parties, must be regarded as an integral part of the process of choosing public officers, and as an election law."

In Spier v. Baker, 120 Cal. 370, 52 Pac. Rep. 659, the court said: "As before suggested, these elections are made mandatory by the law. Revenue is raised by the ordinary means of taxation upon all the property of the State to pay the expense of conducting them. Their exclusive conduct and manageemnt is taken from political parties, associations and individuals, and placed in the hands of the State. Their validity can only be upheld

upon the theory that they are matters of vital import to the general welfare of the State, and therefore matters in which every citizen and every taxpayer is beneficially interested. In other words, the legislature believing a sound public policy demanded such a course, has made these elections a State institution.     *     *     * The word 'election,' as here used, refers to elections affecting the political life of the State. This is such an election. It is essentially a political election 'authorized by law,' and therefore an election within this provision of the constitution."

I quite agree with the conclusion in this opinion that primary elections effect the "political life of the State." They are much more important than the general elections because they irrevocably choose the men who are to fill the various offices. Not only the law books, but the works on political economists are full of expressions of the pernicious power and influence of the liquor traffic on elections, and one of the purposes of the provision of Article XIX was to remove this influence as much as possible from elections which affect the political life of the State.

In the case of State v. Hirsch, 125 Ind. 207, 24 N. E. Rep. 1062, 9 L. R. A. 170, the court had under consideration a statute making it a crime to sell or give away intoxicating liquors "on the day of any election," and the court said: "The words 'primary election,' we may say, are as well understood to mean the act of choosing candidates by the respective political parties to fill the various offices as the word 'election' is to mean the final choice of all the electors of the persons to fill such offices; so that the words 'any election' clearly include primary elections, and such elections come within the letter of the statute. The object and purpose of the

statute was to prevent elections from being influenced by the use of intoxicating liquors, and to put it beyond the power of any person to secure an election to office by the use or influence of intoxicating liquors; and, as it is the first step to an election to an office by all the electors to be chosen as a candidate of some political party at the primary election held by such party, it is manifestly as important to prohibit the sale of intoxicating liquor on the day of a primary election as upon the day of the final election by all the electors; therefore primary elections manifestly come within the spirit as well as the letter of the law. Public welfare demands purity in primary elections at which the candidate is elected, as well as the election at which the officer is chosen to fill the office; and it is but fair to presume that the legislature intended to remove all improper influences from one as well as the other; and by the use of the words 'any election' it was intended to prohibit the sale of intoxicating liquors both on the day of electing or choosing the candidates, as well as the day of electing or choosing the officer."

In the case of Leonard v. Commonwealth, 112 Pa. St. 607, 4 Atl. Rep. 220, Leonard had been elected to office by a large majority, and had received his certificate of election and entered upon the duties of the office, and was ousted because of his violation of an Article of the constitution which declared that any person who "while a candidate for office" shall be guilty of bribery, fraud or wilful violation of *any election law* shall be forever disqualified from holding any office of trust or profit. It was contended in his behalf that as the bribery or fraud that he was charged with, was committed in a primary election, it was not one of the election laws of the Commonwealth, and the violation of its provisions

was not a violation of any election laws. The Supreme Court decided adversely to this contention, and in passing upon it said: "What is an election law? Here again we must bring to our aid the common and popular use of words. Our laws are intended for the people, who are presumed to read and understand them. They are not like the edicts of the Roman Emperor Caligula, which Dio Cassius says, were written in very small characters and hung up so high that the people could not read them. When laws are made by a popular government, that is to say, 'a government of the people, by the people, and for the people,' we may safely assume that words in a statute or a constitution are used in the sense in which the people who have made the statute or constitution understood them. So that when the people inserted in their constitution the words, 'any election law,' it is fair to assume that they meant any law relating to elections. It is idle to say that a statute which prescribes the hours when the polls shall open and close is an election law, while a statute which punishes bribery or fraud in an election officer is not an election law. They both relate to the same subject, and the one is as much an election law as the other.

"Conceding all this, it was contended on behalf of the defendant, that primary elections are not elections at all within the meaning of the Constitution, and that a statute regulating them is not an election law."

"That they come within the mischief intended to be remedied is too plain for argument. Under our frame of government a vast system of political machinery has grown up by which elections have been for many years practically controlled. It is so far-reaching in its effects that the people have in many instances little to do at the polls beyond the ratification of what had been

already done by nominating conventions. Such conventions have often been controlled by the very influences which the Constitution and the Act of 1881 seek to strike down. The influence which these primary elections have for good or evil upon the politics of the country is overshadowing. In many portions of the State, as is well known, a nomination by a convention of one of the parties is practically the equivalent of an election; in some instances it is the precise equivalent, as in the case where there are two persons to elect, and the elector is allowed by law to vote for but one. The importance of the relation of the primary to the general must be apparent to every one who does not shut his eyes that he may not see, and stop his ears that he may not hear. Primary elections and nominating conventions have now become a part of our great political system, and are welded and riveted into it so firmly as to be difficult of separation. The act of 1881 recognizes this fact; it treats primary elections as part of a great system; it declares them to be elections to be regulated by law to some extent; and prescribes and punishes certain frauds committed thereat. It concerns elections in a most important sense. * * * By the words, 'any election law,' the framers of the Constitution and the people who adopt it, evidently meant to include any Act which the legislature might thereafter enact for the purpose of purifying our elections. The Act of 1881 was passed to give effect to the constitutional provision, and it matters little at what stage of the campaign the fraud is committed. It is as much an election law when it strikes at the fraud at the primary election as when it arrests the fraudulent ballot just as it is ready to be dropped into the box at the general election. We would belittle the Constitution and fritter away one of its

best and wisest provisions were we to give it the narrow, technical construction claimed for it by this defendant."

The statutes of Kansas makes detailed provisions for persons in the Military Service of the State or Nation, who are absent from the township or ward on the day of election, to vote at the places where they may be stationed. These provisions were made part of the statutes, prior to the enactment of the primary election law. Under the primary law, which provided that statutes concerning elections as far as consistent with the Act, shall apply to primaries, it was held that the provisions of the General Statutes of 1906 were applicable to primary elections, and a peremptory writ of mandamus was issued to compel the Secretary of State to prepare poll books and tally sheets for the use of voters of the State absent in the Military Service; so that they could vote in the primary. Satte ex rel. v. Botkin, 98 Kan. 694, 158 Pac. Rep. 1119.

In State ex rel. Guion v. Miles, supra, the Supreme Court of Missouri said: "Comparatively early in the history of this Commonwealth experience demonstrated that it was essential, in fact that it was an absolute necessity, to protect by strict laws the rights of the voter at general elections, and in recent years it has become manifest that it is just as essential and important to control by positive enactment the nomination of candidates as to regulate the procedure of their elections at the general election under the laws of the State; hence we can conceive of no matter applicable to our election system, in which the public should be more interested than in the selection of the candidates of the leading political parties, some of whom at least will be chosen to administer the affairs of State and municipal government. It is clear, therefore, that the primary election

is the initiative step in the selection of public officials, therefore, we see no escape from the conclusion that the duties of the general committee of the City of St. Louis, which calls the official primary and recommends and suggests the judges and clerks of such primary elections, are not only of an official character, but as well as the duties in which the public are deeply interested in having faithfully and conscientiously performed."

The primary election of June 4th will irrevocably select the two Justices of the Supreme Court and the Attorney General of Florida whose terms of office will commence on January 7th, 1919,—offices of extreme dignity and importance and of State-wide powers and duties;—only death or the voluntary acts of the parties themselves, being capable of thwarting the will of the people expressed by their ballots in that election.

If the protection that Article XIX seeks to give to voters and candidates alike, from the almost omnipotent influence of the majority in a local option election, is not to be afforded them in the primary and determining election, and this constitutional protection is made applicable only to that perfunctory episode called a general election, it becomes through judicial construction, "as sounding brass, or a tinkling cymbal."

I am firmly convinced that the letter and the spirit of the constitution are opposed to holding these elections within sixty days of each other, but if I entertained any doubt as to the letter of the constitution,—which I do not,—I would still feel bound by its spirit, not unmindful that we are ministers of the constitution; "not of the letter, but of the spirit, for the letter killeth, but the spirit giveth life." I think the injunction should be granted.