THE FIDELITY & CASUALTY CO. OF NEW YORK, APPELLANT, *v.* THE NILES BANK CO. ET AL., APPELLEES.

(No. 1114—Decided January 10, 1946.)

*Messrs. Howell, Roberts & Duncan,* for appellant.
*Mr. Paul Z. Hodge* and *Mr. W. F. MacQueen,* for appellees The Niles Bank Company and The Niles Holding Company.
*Mr. William P. Barnum,* for appellee The Mahoning Valley Sanitary District.

NICHOLS, P. J. This cause has been submitted to this court on appeal on questions of law by plaintiff, The Fidelity & Casualty Company of New York, from the "order, judgment and decree" rendered against it and in favor of the defendants, The Niles Bank Company, The Mahoning Valley Sanitary District and The Niles Holding Company, in the Common Pleas Court of Trumbull county, Ohio, denying plaintiff, appellant herein, the relief sought in its second amended petition and dismissing same. The action was by a surety for an accounting of collateral security and a money judgment.

The Mahoning Valley Sanitary District, hereinafter referred to as the district, is an Ohio corporation organized and existing under authority of the "Sanitary District Act of Ohio" (Sections 6602-34 to 6602-106, inclusive, General Code). The district operated a sanitary water district in Trumbull and Mahoning counties.

The Niles Trust Company was an Ohio corporation doing a general banking business in Niles, Ohio, and will be referred to herein as the trust company. The

name of that company was subsequently changed to The Niles Bank Company, under which name it is now doing a general banking business at Niles. The new company will be referred to herein as the bank company.

The Niles Holding Company is an Ohio corporation organized for the purpose of receiving and liquidating certain assets of The Niles Trust Company.

The plaintiff, The Fidelity & Casualty Company of New York, is a corporation engaged in the business of writing surety bonds and authorized to transact business in Ohio. It will be referred to herein as the surety.

On the 17th day of February 1926, the directors of the district adopted resolution No. 7, as follows:

"Be it hereby resolved that the following depositories be designated as three of the depositories, and others shall be designated at a later date, for the deposit of funds of The Mahoning Valley Sanitary District:

"The First National Bank of Youngstown, Ohio, The Commercial National Bank of Youngstown, Ohio, The Niles Trust Company, Niles, Ohio."

At no time did the district directors designate any of the named depositories as "temporary or assistant treasurer or treasurers."

On December 15, 1930, on written application of the trust company, the surety executed a $50,000 bond, guaranteeing that the trust company would pay to the district its deposit, the district then having on deposit with the trust company a much larger amount of money than $50,000. Further reference will hereinafter be made to the written application of the trust company to the surety for the execution of its $50,000 bond, since we conclude that the information contained in such application, upon the form furnished by the sure-

ty, is of vital importance to the decision of this appeal.

At the close of business on the 28th day of September 1931, while such $50,000 surety bond was in full force and effect, the district had on deposit with the trust company the sum of $435,379.07 and held as security therefor certain collateral in the form of public bonds and notes secured by mortgages, all of the face value of $454,000.09, in addition to the $50,000 surety bond executed by the surety.

On that day, The Niles Trust Company was closed by order of the Superintendent of Banks of the state of Ohio. Shortly thereafter, the district made demand upon the surety and the Superintendent of Banks for the payment of all sums then on deposit with the trust company to the credit of the district, and particularly made demand, with threats of suit, upon the surety for the payment of $50,000, secured by its bond. On January 12, 1932, the surety paid to the district $50,000, the district then delivering to the surety its receipt therefor in writing, and in writing assigning to the surety an undivided interest, in the amount of $50,000, in the deposit of the district with the trust company and subrogating the surety, to the extent of its payment, to all rights of recovery which the district had against the trust company and any other person on account of loss in connection with the deposit.

The language of such assignment agreement by the district to the surety, designated "assignment," makes no mention of an assignment to the surety of any portion of the collateral held by the district as security for its deposit, but the assignment specifically states that the purpose of this instrument is "to subrogate The Fidelity & Casualty Company of New York and to endow it with any and all rights of whatsoever nature by or accruing to the said The Mahoning Sani-

tary District to the extent of the above mentioned payment.''

On January 22, 1932, a ''certificate of proof of claim'' was issued by the Superintendent of Banks to the district in the sum of $50,000, and such certificate was assigned and transferred by the district to the surety.

Although the surety was a paid one, its bond provided that if the amount of the assured's deposit at the time of default of the bank exceeded the amount of the bond, the surety should be entitled to share with the assured the amount of any dividend or payment received from the bank in the proportion that the amount of the bond bore to the total deposit at the time of default, and, further, that the surety should be subrogated in the same proportion to all other rights of the assured against any person or corporation, as respects a default on the part of the bank, and the assured should execute all papers required to secure the surety such rights. The ''assignment'' referred to above was doubtless executed pursuant to the provisions of the bond.

The bond executed by the surety provided also that if the assured at the date thereof or at any time thereafter should hold in addition to the bond any guarantee, bond or other security, against the loss covered, the surety should not be liable for a larger proportion of any loss than the proportion that the amount of the bond bore to the total amount of security against the loss. Why the surety, when demand was made upon it, did not avail itself of this provision, is not clear, but it seems probable that it relied on its subrogation rights.

It is clear from the foregoing recital that the surety, being the owner by assignment of the claim of the district against the trust company in the amount of $50,-

000, was clothed with authority to settle with the trust company, or its reorganization committee, hereinafter referred to, all its rights and claims against the trust company.

Subsequent to the Superintendent of Banks' taking over of the trust company for liquidation, a reorganizing committee was formed as a part of a program leading to the reopening of the bank, and that committee negotiated with the surety and with other surety companies which carried liability covering certain other deposits of public funds, such negotiations resulting in an agreement, dated November 11, 1932, and entered into in writing between the surety and the reorganization committee, whereby the committee proposed to pay on the day of the reopening of the bank and the surety agreed to accept, in full settlement of its claim, the sum equivalent to 50 per cent of its claim.

In such agreement there is a recital that by reason of the payment of the sum of $50,000 to the district by reason of its bond, the surety "has become a common creditor of the said bank to the extent of $50,000," and a further recital that the surety "desires to cooperate and participate in the program leading to the reopening of the bank."

In the written agreement between the surety and the reorganization committee it is stipulated that on the day of the opening of the bank, the bank shall pay to the surety "a sum equal to 50% of its present claim against the bank, said claim being $50,000 and 50% thereof being $25,000."

It is further stipulated and "mutually agreed that upon payment of the said 50% that said party of the first part will execute and deliver to the said bank a full and complete release of any and all claims that it may have against the said bank by reason of having paid any amount as surety upon the bond of said bank

to secure its said deposits." And it is provided that this agreement is contingent upon similar agreements being made with other surety companies and like settlements being made with each company according to its respective interest, and in the event any common creditor receives a settlement greater than 50 per cent in cash at the time of reopening, the party of the first part will receive as good a percentage of its deposit as the most favored common creditor who receives a cash settlement with the bank.

After securing like agreements with other surety companies which had issued bonds securing deposits of other public funds, the trust company filed its application in the Common Pleas Court of Trumbull county praying for approval of its plan for the reopening of the bank and for an order authorizing the reopening of the bank upon the terms and conditions set forth in such application.

An "order to show cause" why the application of the trust company should not be granted and the plan approved for the reopening upon the terms and conditions set forth was duly entered and notice was given pursuant to such order.

Among other matters set forth in the reopening application, it was alleged that "agreements of settlement have been entered into by the bank with the surety companies covering the liability of the bank upon surety bonds which were required by law in connection with the deposit of public funds upon terms for the best interest of the depositors, and that said agreements of settlement with said surety companies have been approved by the Superintendent of Banks of the state of Ohio and which settlements provide for the payments to the said surety companies an amount equal to fifty per cent (50%) of their claims."

The application further set forth certain proposed

changes in the capital structure of the reopened bank, consideration of which makes it appear that the shareholders' rights and liabilities would be materially altered.

The prayer of the application, as well as the notice given pursuant to the order to show cause, among other things provided that cause be shown by a day fixed why the rights of the depositors should not be materially altered as therein set forth, and why "the agreements of settlement made by The Niles Trust Company with the various surety companies covering the liability of the bank in connection with surety bonds which were required by law in connection with deposit of public funds, should not be ratified, confirmed, approved and made binding upon said bank and said surety companies."

In due course the plan was approved, the bank was reopened pursuant to the order of the court, the name of The Niles Trust Company was changed to The Niles Bank Company and the various surety companies, including the surety, were paid 50 per cent of their respective claims. Receipt for $25,000, dated June 15, 1933, was delivered to the bank by the surety, such receipt reciting that the payment was "in full for all claims and demands which we have or claim to have against the said The Niles Bank Company, particularly those shown and referred to in a memorandum of agreement between The Fidelity & Casualty Company of New York and the reorganization committee of The Niles Trust Company dated November 11, 1932."

That receipt, prepared by the attorney for the surety, further recites:

"It is the intention of this receipt to release The Niles Bank Company and the reorganization committee of The Niles Trust Company from any and all liabilities of whatever kind or nature growing out of

the said surety company having paid to various political subdivisions having deposits of public funds with The Niles Trust Company previous to its closing. And further, as an acknowledgment of the receipt of the amount provided for in the said agreement dated November 11, 1932.''

Much being made of it by counsel for the surety, it is here proper to set forth that in the reopening application it is stated ''that in the event said bank is permitted to open and resume business there will immediately be released and paid upon demand to depositors the following amounts: * * * (e) all trust funds.''

In the journal entry of the court, approving the plan and authorizing the reopening of the bank upon the terms set forth therein, it is stated:

''That upon the reopening of said The Niles Trust Company the following deposits shall be released for payment in full: * * *

''(d) All trust funds.''

In that connection, however, it is proper to say that the reopening journal entry also sets forth:

''That the contracts of settlement between said The Niles Trust Company and the several insurance and indemnity companies are found to be fair and reasonable and they are hereby approved and made binding upon said companies and the said The Niles Trust Company.''

There is no claim of any irregularity or illegality in the proceeding to reopen the bank pursuant to the provisions of Section 710-89a, General Code, the application having been filed subsequent to March 23, 1933, the effective date of that section, which provides the jurisdiction of the Common Pleas Court, and among other things provides: '

''All depositors and creditors, *including the state or*

*any political subdivision thereof,* if a creditor, who shall fail to file such objections within such time fixed by the court, shall be conclusively deemed to have consented to the resumption of business by such bank upon the conditions approved by the court, and shall be bound by the order of the court approving the same.'' (Italics ours.)

The surety's status was that of an assignee of a political subdivision, the district, and stood in its position in certain respects. Aside from that, the surety was a creditor of the bank by reason of the agreement between it and the trust company as set forth in the application for surety bond, whereby the trust company agreed to indemnify and save harmless the surety from and against any and all losses of every kind that the surety might for any cause sustain or incur by reason or in consequence of its having executed the bond.

In the agreement of settlement the surety represented that it was a common creditor of the trust company (and it was such under the terms of the application for bond) and it agreed, for the consideration named, to release all its claims of whatever kind or nature. There was, therefore, no mutual mistake of fact at the execution of the settlement agreement, whether or not the parties at the time fully appreciated the nature of all rights of the surety against the trust company. Of course, the surety's position could be either that of a common or preferred creditor on account of the same obligation, but satisfaction of the obligation terminated all its rights.

The provisions of Section 710-89*a*, General Code, above quoted, make no distinction between a common and a preferred creditor.

After the bank resumed business on June 15, 1933, under its changed name, and the $25,000 was paid to

the surety in settlement of its claims in accordance with the agreement approved by the court, certain of the collateral held by the district as security for its deposit was sold and the liability of the bank to it thereby reduced to $147,610.97 as of September 22, 1934, after allowing credit by the district for the $50,-000 received from the surety. On that date, the directors of the district passed a resolution authorizing the withdrawal of the balance of its funds from the bank and the surrender of the remaining collateral held by the district, and this was accordingly done. At that time, as shown by the record, the value of the collateral surrendered to the bank was from $70,000 to $100,000.

In the meantime, about December 30, 1933, the Attorney General of Ohio rendered an opinion that the deposit of the district funds with the trust company was an illegal deposit and the transaction was null and void, assigning as reason therefor that at the time the trust company was selected and designated a depository the district had failed in its resolution, to designate the banks therein named as "temporary or assistant treasurer or treasurers," and cited the following language of Section 6602-79, General Code:

"* * * if it should be deemed more expedient to the board of directors, as to moneys derived from the sale of bonds issued or from any other source, said board may by resolution, select some suitable bank or banks or other depository, which *depository* shall give good and sufficient bond, as temporary or assistant treasurer or treasurers, to hold and disburse said moneys on the orders of the board as the work progresses, until such fund is exhausted or transferred to the treasurer by order of the said board of directors. For such deposits the district shall receive not less than

two nor more than four per cent interest per annum." (Italics ours.)

The opinion of the Attorney General is reported in Vol. 3, Opinions of Attorney General (1933), 1998, No. 2088. The opinion seems to proceed on the theory that the statute requires the board of directors to designate the banks, in which its funds are deposited, as temporary or assistant treasurer or treasurers, and, since a treasurer has no title to funds coming into his hands, such funds are trust funds and entitled to preference in payment from the assets of a bank in liquidation.

In our judgment the cases cited by the Attorney General in support of the above theory are not authority for the opinion that the funds in question here were trust funds, the facts in those cases being entirely dissimilar to the situation presented here.

The Niles Trust Company, designated as a depository, agreed to and did pay interest on the funds deposited with it by the district, in accordance with the interest rate provided in the statute.

It is our view that the quoted provision of Section 6602-79, General Code, clearly authorizes the district directors to select the banks as depositories, which was done, and that the words, "as temporary or assistant treasurer or treasurers," modify bond and mean simply that such selected depositories shall give the kind and character of bond as a temporary or assistant treasurer or treasurers are required to give. The proper interpretation of the word, "as," is that it means "like" or "similar to." See 4 Words and Phrases (Perm. Ed.), 286, which cites *Van Pelt* v. *Hilliard*, 75 Fla., 792, 78 So., 693, 697, L. R. A. 1918E, 639. See, also, the definition of the word, "as," given in Webster's International Dictionary.

Certainly no reasonable construction of the statute

can be that the bank selected as a depository shall in fact be a treasurer or assistant treasurer of the district, for the law is well settled that no treasurer of public funds can use the same for his or its own profit, it being definitely contemplated by the statute that the depository bank will have the right to use and invest such deposited funds in the same manner as it may invest the deposits of private individuals, since the depository must, by the provisions of the section, pay the district for such deposit not less than two nor more than four per cent interest per annum. We have not discovered an instance where a treasurer, assistant treasurer or temporary treasurer, as such, has been required to pay interest on the funds held by him or it, or where a treasurer, either assistant or temporary, has any right to use public funds for his own profit.

The question remains, however, whether the appointed depository bank gave "good and sufficient bond" as or similar to that required of a temporary or assistant treasurer. Until the giving of the $50,-000 bond executed by the surety, the depository bank had not given any "bond" in the technical meaning of that word, which imports a written instrument, with surety or sureties, guaranteeing the faithful performance of the acts or duties contemplated.

Nowhere in the "Sanitary District Act of Ohio" do we find any provision for the appointment of a temporary or assistant treasurer.

Section 6602-44, General Code, provides that "the secretary shall serve also as treasurer of the district, unless a treasurer is otherwise provided for by the board."

Section 6602-79, General Code, provides:

"Said district treasurer shall, at the time of taking office, execute and deliver to the president of the board

of directors of the said district, a bond with good and
sufficient sureties, to be approved by the said board of
directors, conditioned that he shall account for and
pay over as required by law, and as ordered by said
board of directors, any and all money received by him
on the sale of such bonds, or any of them, or from any
other source.''

Here the board of directors required the depository
bank to furnish collateral security in the first instance,
later supplemented by the surety bond executed by the
surety. Can it now be claimed that the district's vol-
untary act in accepting such collateral security for the
deposit of its funds, instead of a written bond with
good and sufficient sureties, was such an unlawful act
as to constitute the deposit an unlawful deposit, creat-
ing the relationship of trustee on the part of the de-
pository bank and securing to the district a preference
over other depositors upon liquidation of the bank?
In a court of equity, the question answers itself.

We are not unmindful of the recent decision of the
Supreme Court of Ohio, in the case of *In re Cattell,*
146 Ohio St., 112, 64 N. E. (2d), 416, in which the
majority of the court gave a strict interpretation of
the word ''bond,'' and held that this word as used in
Section 11882, General Code, necessarily imports a
written instrument executed by a surety. In the opin-
ion Judge Turner clearly indicated that the decision
is limited to a case involving the personal liberty of
one found guilty of contempt for claimed violation of
a restraining order of the court and who challenges
the jurisdiction of the court.

No doubt the Legislature, in its wisdom, could have
provided that the funds of the district when deposited
in a depository bank, either with or without the re-
quired bond, would have a preference over other de-
posits, but it did not do so. Had the law so provided,

all other depositors in such bank would have been bound with notice thereof. The result of such provision of law would ruin any bank. That was the appealing reason for the decision of the Supreme Court of Ohio in the case of *Fidelity & Casualty Co. of New York* v. *Union Savings Bank Co.*, 119 Ohio St., 124, 162 N. E., 420. In that case, in which the plaintiff was the surety here, the court held that the depository act involved, Section 321 *et seq.*, General Code, neither expressly nor impliedly gave to the state priority of payment out of funds of a banking institution in the event of insolvency. True, the deposit there was a legal deposit, but how much stronger the reason would apply to the situation in this case.

The instant case is clearly distinguishable from that of *Franklin National Bank of Newark, Ohio*, v. *City of Newark*, 96 Ohio St., 453, 118 N. E., 117, L. R. A. 1918E, 676, where the city treasurer, without any authority of law or direction of the city council, deposited city funds in the bank, without any requirement of the bank to pay interest on such deposit, and where the bank made a profit from the use of such funds. What the court did in that case was to require the bank to account for and pay over to the city the fund and all profits arising from the use of the deposit. There was no question of insolvency of that bank or determination of a preferential status of the deposit on liquidation. There was no necessity of the court to make such determination.

After the opinion of the Attorney General, above referred to, was rendered, this action was instituted, in which the surety seeks an accounting of the collateral security held by the district at the time of the execution of the $50,000 bond, still held by the bank when it was taken over for liquidation. The surety seeks the recovery of $25,000, with interest, being the

difference between the amount paid to the district and the amount received from the bank on settlement of the surety's claims. It is the claim of the surety in its second amended petition that the district was a preferred creditor of the trust company, such claim being based on the theory that the district's deposit constituted trust funds in the possession of the trust company when it closed and on the reasoning of the Attorney General in his opinion; that the district was entitled to be paid in full under the reopening order of the court; that upon the surety being subrogated to the extent of $50,000 to the right of the district in such trust funds the surety was entitled to be paid in full instead of the $25,000 which it received upon its settlement agreement with the reorganization committee; and that such agreement and the receipt given pursuant thereto were executed by reason of a mutual mistake of the parties, it being alleged that at the time all of the parties acted in the belief that the district was a common creditor of the trust company, and that it was never the surety's intention to settle its claim as a preferred creditor.

The surety further claims that by reason of its right to subrogation, either in accordance with its contract with the district or under the equitable doctrine of subrogation, the district was without authority to surrender, in return for the balance of its deposit, the collateral security held by it, without accounting to the surety therefor.

We have not attempted to state in the language of the second amended petition the claims of the surety, but give our understanding of the substance of such claims.

As stated above, the judgment and decree of the Common Pleas Court was for defendants. In its conclusions of law, the trial court held that the deposits

by the district were not made in the manner required by Section 6602-79, General Code, as the bank was never selected as a temporary or assistant-treasurer; that the $50,000 bond given by the bank was not a good and sufficient bond for a half million dollar deposit; and that, therefore, the deposit was a trust fund and the right to its withdrawal constituted a preferred claim. However, the trial court held that the surety had, by the settlement agreement, released its rights as either a preferred or common creditor and found against the surety.

On this appeal it is stated in the surety's brief that the issues in this court are purely legal and are as follows:

"1. Whether this court will order the enforcement of the decree of the Common Pleas Court which ordered, upon the reorganization of The Niles Trust Company, that all trust funds should be paid by the bank in full.

"2. Whether the court will apply the law which gives to either party the right to avoid a settlement when such settlement contract has been made under a mutual mistake of facts."

The second proposition, above quoted, has been amplified in oral argument and reply brief of the surety, and it now claims that the court should avoid the settlement contract if made under a mutual mistake of law and fact, and that the trial court, sitting as a court of equity, should have avoided the settlement contract even though it was entered into solely because of a mutual mistake of law.

Being impressed with the sincerity and force with which the claims of able counsel representing all parties have been presented in this court, the writer of this opinion has painstakingly examined the pleadings, the transcript of the proceedings in the Common Pleas

Court and the voluminous record with numerous exhibits, as well as the briefs and authorities cited. This has consumed much time as the case was submitted at our September 1945 term in Trumbull county, but since the action was pending for 11 years in the trial court, all without unnecessary delay on the part of the trial judge or counsel, we have felt it our duty to set forth at length the material facts gathered from the record.

Was there a mutual mistake of facts which avoided the settlement agreement? Our answer to this question, arrived at from our thorough consideration of the pleadings and evidence, is "no."

The application of the trust company to the surety for the issuance of the surety bond plainly set forth that the trust company then had on deposit $425,943.24 of the funds of the district, bearing 2, 2½ and 3 per cent interest and secured by "state and county" collateral in the amount of $493,575.64.

The application showed also that the bank held other deposits of certain cities and school districts, secured by "surety" bonds.

It was thus apparent to the surety that the only portion of the funds of the district which were secured by a bond, as distinguished from collateral, was such as would be secured by the $50,000 bond applied for and which the surety executed pursuant to such application. The application did not purport to be made by the trust company as a temporary or assistant treasurer of the district.

The application gave a list of public and other deposits covered by personal or corporate surety bonds or secured by collateral, in detail listed the names of such depositors, the amount deposited, the rate of interest paid thereon, the name of surety or description of collateral and the amount of bond and collat-

eral, and gave answer to every question contained in the printed form furnished by the surety. We find that the surety had full knowledge of all facts which it now claims rendered the deposit an illegal one thus making the deposit "trust funds" in the possession of the trust company. It follows that the mistake, if any, in assuming, at the time of entering into the settlement agreement, that the relationship between the trust company and the district was that of debtor and creditor was purely and only a mistake of law, if we consider the question in the most favorable, but not tenable, aspect.

We need not determine whether, when the surety executed and delivered its surety bond for $50,000, that portion of the deposit thereby became a legal deposit because secured by a good and sufficient bond, in the strict meaning of that word. Whether a trust relation existed between the trust company and the district is not decisive of this case. The surety with the advice and assistance of able counsel and with full knowledge of the facts executed the settlement agreement, and did so with the expressed intention of inducing the reopening of the bank, filed no objection to the plan of reopening, consented to the court's approval of the settlement agreement, in effect caused the reopening order and assisted in altering the position of the shareholders and other depositors of the bank, as well as other surety companies, all of whom, including the district, had the right to rely upon the representations of the surety that its claims would be settled in full upon payment of $25,000, which it received with the approval of the court.

We do not find the defense of estoppel specifically alleged in the pleadings of the defendants, but therein are recitals of facts constituting estoppel and a denial of right to relief, and at the hearing evidence was re-

ceived, without objection, of facts which clearly raised that defense. It would have been proper, on motion, to have allowed amendment, but without amendment the issue was in the case, especially in view of the statute which specifically and conclusively bars the surety from assailing the reopening order of the court.

The court of equity, in considering whether the contract of settlement should be avoided on the ground of mistake of law only, and some authority has been presented to that effect, would properly weigh the equities of all parties concerned and was not required to avoid the settlement on that ground.

We find no merit in the claim of the surety that it is entitled to relief because the reopening application, as well as the court's order approving same and authorizing the bank to resume business, set forth that all trust funds be first paid. The court which rendered the decree in this case is the same court which granted the reopening order and was the proper tribunal to give construction to that order as set forth in its journal, and we find no error in the interpretation given thereto. It is clear that the court did not consider at that time that the district's deposit was a trust fund or that the surety's claim was a preferred one. The court certainly did not intend that the deposit should be paid in full and at the same time approve the settlement agreement whereby the surety was to and did receive $25,000 in full settlement of all its claims.

The reopening order of the Common Pleas Court has the force and effect of a final judgment and the surety is a party thereto and bound thereby in the absence of fraud, there having been no appeal therefrom. It will not do to say that the surety should be relieved of the force and effect of that judgment because the surety was mistaken in its legal rights. That

would destroy the finality of judgments and set a dangerous precedent. Every other party to that proceeding could as well claim some relief on the ground that it did not know of its legal rights at the time. It is conceded that there was no fraud practiced by defendants, but that there was only a mutual mistake.

The district was not a party to the agreement of settlement between the surety and the reorganization committee of the trust company. There was no failure of the exercise of good faith on the part of the trust company or the district, which would be due the surety by reason of the trust relationship arising from the execution and delivery of the surety bond. There is no claim of any fraud or untruthfulness in the answers of the trust company to the questions in the application for the bond, nor can we perceive any material information then within the knowledge of the trust company or the district which was not set forth in the application for bond.

Emphasis has been placed by the surety upon the fact that in the district's separate answer and cross-petition it alleges and admits that its deposit was a trust fund, and that it was entitled to be paid in full as a preferred creditor of the trust company. Such allegations are mere conclusions of law and not statements of fact, but in any event would not bind the bank.

It is further claimed by the surety that the settlement agreement with the reorganization committee and the receipt for $25,000 executed pursuant thereto were intended to release only the bank, the district not being a party thereto, and, therefore, the surety has not released the district from liability for surrendering the collateral security upon payment of the balance of its deposits; and that under the subrogation agreement with the district the latter violated its terms and should be held liable in this action. The answer to that

claim is that when the surety settled with the trust company, and that settlement was approved by the court, all rights of the surety to subrogation, whether under its agreement with the district or upon the equitable doctrine of subrogation, perished with such settlement. Subrogation cannot exist independent of a right of recovery against the party causing the loss.

No prejudicial error is found in the judgment and decree of the Common Pleas Court, and, accordingly, such judgment and decree must be and is affirmed.

*Judgment and decree affirmed.*

CARTER and PHILLIPS, JJ., concur.