Elton Gissendanner Executive Director Department of Natural Resources Tallahassee
QUESTIONS:
1. Under the provisions of s. 253.023(2), F. S., created by ch. 79-255, Laws of Florida, if, on July 1, 1980, the balance of the Conservation and Recreation Lands Trust Fund is $3 million, could the Department of Revenue credit an additional $3 million to the fund in fiscal year 1980-1981 for a total of $6 million; likewise, if, on July 1, 1981, the balance of the fund is $3 million, could an additional $20 million be credited for fiscal year 1981-1982 for a total of $23 million?
2. Can funds be obligated under the provisions of s. 253.023(3), F. S., for the acquisition of a project in one fiscal year when the purchase will not be consummated until the next fiscal year; could this be done if the funds being obligated will revert to the General Revenue Fund at the end of the fiscal year?
3. Under the provisions of s. 253.023(4), F. S., can interest received on the investment of funds in the Conservation and Recreation Lands Trust Fund be credited to said fund and used to purchase projects in the fiscal year within which the interest accrues; if such interest causes the balance of the fund to exceed $3 million on June 30, 1980, will it carry over to fiscal year 1980-1981?
4. Can the acquiring agency pay, under the provisions of s.253.025(3), F. S., for title insurance and the cost of a survey from funds available for land acquisition if the seller refuses?
5. Can the Board of Trustees of the Internal Improvement Trust Fund authorize, under the provisions of s. 253.025(5)(d), F. S., a purchase in excess of the highest appraisal?
6. Should acquisition projects which were in progress on October 1, 1979, when ch. 79-255, Laws of Florida, took effect, be reinitiated under the procedures set forth in that act?
SUMMARY:
The Conservation and Recreation Lands Trust Fund can be credited with an additional $3 million on July 1, 1980, for fiscal year 1980-1981, although the balance at the time may already be $3 million, and similarly on July 1, 1981, $20 million can be credited to the fund; the board is not authorized to `obligate' funds, thereby avoiding a transfer of excess moneys to the General Revenue Fund, when an acquisition is not finalized until the following fiscal year; interest can be received on the investment of moneys in the fund and used to purchase projects, and such interest is not subject to the limitations imposed by s. 253.023(2), F. S.; the acquiring agency cannot pay for title insurance, but such agencies can pay for the cost of a survey; there is no authority for a purchase in excess of the highest appraisal; acquisition projects in progress on October 1, 1979, must comply with the provisions of s. 253.025, F. S., before the state can commit to the acquisition of such lands, and any projects not in compliance should be reinitiated.
Before addressing these questions individually, I must reiterate the well-settled principle that the meaning and intent of statutes must be primarily determined from the language of the legislation itself, not from conjecture. Maryland Casualty Company v. Sutherland, 169 So. 679 (Fla. 1936). Words used in a statute are to be construed according to their plain and ordinary signification, unless used in a technical sense. State v. Tunnicliffe, 124 So.2d 279 (Fla. 1929); Gaulden v. Kirk,47 So.2d 567 (Fla. 1950); and Gasson v. Gay, 49 So.2d 525 (Fla. 1950). The legislative intent as deducible from the language employed in a statute is the law, Pillans and Smith Co., Inc. v. Lowe,157 So. 649 (Fla. 1934); State v. Knight, 124 So. 461 (Fla. 1929); and Overman v. State Board of Control, 62 So.2d 696 (Fla. 1952); and when ascertained, the statute must be given its plain and obvious meaning. A. R. Douglass, Inc. v. McRainey, 137 So. 157 (Fla. 1931), and Van Pelt v. Hilliard, 78 So. 693 (Fla. 1918). Thus, in responding to these questions, it will be necessary to closely examine the language of ch. 79-255, Laws of Florida.
AS TO QUESTION 1:
Section 8, ch. 79-255, Laws of Florida, creates s. 253.023(2), F. S., which provides in pertinent part that:
 The Department of Revenue, upon compilation of each month's receipts of the severance tax, shall credit the amount provided in this section to the fund, commencing with the funds collected in October 1979. If the moneys credited to the fund at any time during the fiscal year or the balance of the fund at the end of the fiscal year exceed $3 million for fiscal year 1979-1980 or 1980-1981, in either case, the excess shall be transferred to the General Revenue Fund. If the moneys credited to the fund at any time during the fiscal year or the balance of the fund at the end of the fiscal year exceeds $20 million for fiscal year 1981-1982 or any fiscal year thereafter, in either case the excess shall be transferred to the General Revenue Fund. (Emphasis supplied.)
The title to ch. 79-255 provides that the Conservation and Recreation Lands Trust Fund `is to be credited one-half the moneys collected from the severance tax on oil, gas, and solid minerals,not to exceed $3 million for fiscal year 1979-80 or fiscal year1980-81 and $20 million for subsequent fiscal years.' (Emphasis supplied.) The apparent intent of the Legislature, as evidenced by this language in the title of the act, is that the fund will receive or have distributed to it no more than $3 million in fiscal year 1979-1980 or fiscal year 1980-1981, and it will receive or have distributed to it no more than $20 million in fiscal year 1981-1982 and thereafter. The limitation thus expressed in the title is on the amount that can be `credited' to the fund `for' each fiscal year. Distributions during each fiscal year may not exceed the designated amount. The above-cited provision of s. 253.023(2), F. S., confirms and expressly provides the limit on the amount of severance tax collections which may be `credited' to the fund `during' each fiscal year. This section also provides a limitation on `the balance of the fund at the end of the fiscal year.' By its terms s. 253.023(2) limits the amount that can be `credited' to the fund at any time during fiscal year 1979-1980 to a total of $3 million but also specifies that, at the end of the current fiscal year (June 30, 1980), the `balance' cannot exceed $3 million. Commencing on July 1, 1980, and continuing thereafter during fiscal year 1980-1981, additional moneys may be `credited' to the fund up to, but not to exceed, $3 million during fiscal year 1980-1981; but, again, the `balance' at the end of that fiscal year cannot exceed $3 million.
The language of s. 253.023(2), F. S., is stated in the disjunctive, both as to the designated fiscal periods and as to the designated limitations on the fund. The use of the disjunctive `or' usually denotes alternatives. Thus, if the amount credited to the fund during a fiscal year exceeds the designated limit at any time, or if the balance at the end of a fiscal year exceeds the designated limit, then in either case any such excess is to be transferred to the General Revenue Fund.
It, therefore, appears that on July 1, 1980, an additional $3 million can be `credited' to the fund even though the balance may already be $3 million since the transfer of excess funds to the General Revenue Fund occurs on June 30, 1980, and a new `credit' limit is authorized for fiscal year 1980-1981. During fiscal year 1981-1982 there is a $20 million limit on the amount that can be `credited' during that or any subsequent fiscal year. Thus, if, on June 30, 1981, the fund is at its maximum allowable balance of $3 million, the fund could have a total of $23 million on July 1, 1981, with the addition of the $20 million `credit' at that time.
AS TO QUESTION 2:
Your question appears to contemplate a situation in which an excess may be left in the fund at the end of the fiscal year and in which an acquisition is not yet ready to be finalized. In such a circumstance, your inquiry is whether the state could `obligate' or assign such excess to an acquisition which would become final in the next fiscal year and thereby avoid a `reversion' of the excess to the General Revenue Fund.
Initially, I must point out that s. 253.023(3), F. S., does not address the issue of the `obligation' of funds. Rather, it simply authorizes the Board of Trustees of the Internal Improvement Trust Fund to `allocate' moneys from the fund to acquire the fee or any lesser interest in land in certain designated categories and proportions. Neither does s. 253.023(2) provide for a `reversion' of excess funds to the General Revenue Fund. Rather, it provides for a `transfer' of such excess.
The response to this question must be governed by the earlier response to question 1. There is no expressed authorization in s. 253.023(3), F. S., or elsewhere for the obligation, encumbering, or in any other way removing of moneys from the limitations discussed above, other than by expending such moneys. To the contrary, s. 253.023(2) specifically limits the `balance' of the fund at the end of each fiscal year and provides for the transfer of any excess without exception.
Your question, therefore, must be answered in the negative.
AS TO QUESTION 3:
Section 253.023(4), F. S., provides:
 Moneys in the fund not needed to meet obligations incurred under this section shall be deposited with the Treasurer to the credit of the fund and may be invested in the manner provided by law. Interest received on such investments shall be credited to the Conservation and Recreation Lands Trust Fund.
Clearly this authorizes moneys not needed to meet obligations to be invested and the interest received from such investments to be credited to the fund. In order to determine if such interest is subject to the limitations discussed in question 1 we must examine s. 253.023(2) which creates the limitations. In subsection (2) limitations are placed on the receipts of the severance tax. This subsection refers only to moneys credited to the fund from the severance taxes enumerated in s. 253.023(2)(a) through (d), not from other sources such as interest credits.
Therefore, it would seem that investment earnings are not limited by s. 253.023(2), and any excess over the statutory limits on the dollar amount of the fund attributable to investment earnings would not have to be transferred to the General Revenue Fund.
AS TO QUESTIONS 4 AND 5:
Section 253.025(3), F. S., created by s. 9, ch. 79-255, Laws of Florida, specifies that `evidence of marketable title shallprovided by the land owner. . . . [and] shall be in the form of title insurance or an abstract of title with a title opinion.' (Emphasis supplied.) The use of the mandatory term `shall' leaves no discretion with the board of trustees to provide or pay for such evidence of marketable title. Further, beyond the purchase of lands, s. 253.025(6) clearly prohibits any `dedication, gift, grant, or bequest of lands and appurtenances . . . until the receiving state agency receives sufficient evidence of marketability of title.' The legislative intent appears clearly to have been to require the seller, donor, or grantor to bear the cost of providing the state with such evidence. However, s.253.025(4)(b) clearly requires appraisal fees to be paid by the acquiring agency and further requires the agency to transmit to the fee appraiser a certified survey, except in cases when the board of trustees waives the survey requirement. Thus, such agencies are authorized to pay for the cost of a survey from funds available for land acquisition since this is a necessary element in the acquisition process.
Regarding the amount which can be paid for a parcel, I find no authority for a purchase in excess of the highest appraisal. On the contrary, s. 253.025(5)(d), F. S., states that no offer by the state shall exceed the amount determined by a single appraisal when applicable, the average of two appraisals when applicable, or the average of the two closest appraisals when three appraisals are required.
AS TO QUESTION 6:
The effective date of ch. 79-255, Laws of Florida, is October 1, 1979. On and after that date the provisions of s. 253.025(1), F. S., created by s. 9 of ch. 79-255, are operative and provide that:
 Neither the Board of Trustees of the Internal Improvement Trust Fund nor its duly authorized agent shall commit the state, through any instrument of negotiated contract or agreement for purchase, to the purchase of lands with or without appurtenances unless the provisions of this section have been fully complied with. . . . (Emphasis supplied.)
Thus, the prohibition created hereby is on the execution of any instrument which commits the state to the purchase of lands after October 1, 1979, unless the provisions of s. 253.025 have been followed in all respects regarding such acquisition. It will, of course, be necessary for the board to make this determination of compliance on a case-by-case basis for any acquisition governed by ch. 79-255, and any acquisition projects not in compliance should be reinitiated.
Prepared by: Donald D. Conn, Assistant Attorney General